(48 South. 565.)

No. 17,256.

BALL v. VICKSBURG, S. & P. RY. CO.

(Feb. 1, 1909. Rehearing Denied March 1, 1909.)

1. MASTER AND SERVANT (§§ 206, 224*)—INJURIES TO SERVANT—ASSUMPTION OF RISK.

The master is not liable in damages for injuries received by the servant when the latter is assuming an unnecessary risk and is not engaged in the discharge of any duty assigned to him by, or that he owes to, the master; nor is he liable for injuries resulting from risks incidental to the service for which the servant was employed, which the servant may reasonably be held to have assumed.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 550, 654; Dec. Dig. §§ 206, 224.*]

2. MASTER AND SERVANT (§ 224*)—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

When an employé in a railroad car and repair shop, having with an assistant undertaken to lace together the ends of a belt driving the counter shaft from which a lathe operated by him receives its motive power, has finished such lacing and is merely idling with the belt, instead of putting it in its place on the pulley of the main shaft, the employer is not liable for an accident resulting from the "taking" of the belt by the revolving shaft and the entanglement of the employé therein.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 224.*]

3. MASTER AND SERVANT (§ 218*)—INJURY TO SERVANT—ASSUMPTION OF RISK.

An apprentice 19 years old, of more than average intelligence, who has worked for 2 years and 7 months in a railroad car and repair shop, and who has frequently discharged that function, must be held to have assumed the risk incidental to the putting of a light belt on a main and counter shaft while the former is in motion.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 601–609; Dec. Dig. § 218.*]

(Syllabus by the Court.)

Appeal from Sixth Judicial District Court, Parish of Ouachita; James Pemberton Madison, Judge.

Action by Mary E. Ball against the Vicksburg, Shreveport & Pacific Railway Company. Judgment for plaintiff, and defendant appeals. Reversed, and suit dismissed.

Stubbs, Russell & Theus, for appellant. John Merritt Munholland, for appellee.

## Statement of the Case.

MONROE, J. Plaintiff seeks to recover damages for the loss of her minor son, whose death she imputes to the fault of the defendant, by whom he was employed. Defendant denies the fault imputed to it, and alleges that the death of the minor was the result of his own negligence and of a risk assumed by him from the nature of his employment. The facts, as we find them from the evidence in the transcript, are as follows: The minor, who was about 19 years old and of more than average intelligence, had for 2 years and 7 months prior to his death, with his mother's consent, been working as an apprentice in defendant's car and repair shop, for the purpose of learning the trade of machinist and iron worker, and just before he was killed was engaged in the discharge of a duty which required him to operate a lathe that received its motive power through a counter shaft which was connected with the main shaft by means of two leather belts; the one ("straight") driving the machine forward, and the other ("crossed") driving it backward. The crossed belt broke, and it became necessary to repair it by cutting the ends squarely off and lacing them together, and, as the job required two persons, the minor, Ball, requested Endom, a fellow workman, who was operating a machine near by, to assist him. Endom was, however, interested in his own work and declined to leave it. Ball thereupon applied to Courtney, the foreman, and the latter assigned Copeland (another apprentice, 20 years old, and who had been working in the shop about 18 months) to the duty. The main shaft runs from east to west the whole length of the shop, at an elevation of 18½ feet above the floor, and the counter shaft, about 10 feet long, runs parallel to it, at a distance of 21 feet to the south and 2 feet lower; there being some timbers upon which a person can make his way from one to the

other, and access to the main shaft being obtained by means of a ladder, reaching from the floor to a platform, two planks (2x12) wide, which runs along 2 feet 9 inches below the shaft and projects 16 or 17 inches on the north, and say 8 inches on the south, side. Before lacing the ends of the belt together, it was, of course, necessary that it should be put over both shafts, and, while Ball was (probably) looking for a knife with which to square the ends, Copeland took the belt up on the platform and put it over the main shaft, after which, when Ball joined him and held it, he carried an end across and put it over the counter shaft and brought it back, and then held the two ends while Ball laced them together, holding the belt, at the same time, in such a way as to prevent its "taking" the revolving main shaft. There is no doubt that the lacing had been completed when the accident occurred, as the two ends, laced together, were cut from the belt after the accident, and are brought up as part of the transcript, and Copeland so testifies, without contradiction. As to other matters immediately connected with the accident, there were but three eyewitnesses, and we make the following excerpts from their testimony, to wit:

McCranie, who was operating a machine about 50 or 60 feet to the westward, or southwestward, of a point immediately beneath the place of the accident (called on behalf of plaintiff), says:

"I was running a planer at the time, and he [Ball] came to me to borrow a knife, and I didn't have a knife, and he left me and went up the aisle, and I saw him going up the ladder, and I didn't think any more about it, and the next time I looked he was in the loft. I was on a hard job, and didn't pay particular attention to them; just glanced up my eyes at them three times, and the second time I looked they were at work up in the loft, and the next time I looked he [Ball] was standing up, and the moment I looked he went right over the shaft. * * * The shaft was turning from him, and he was standing with his right side to it. * * * It [his face] was almost toward it. It was inclined to be not exactly at right an-

gles to the shaft. Q. You saw him stand up, and then instantly went over? A. Yes, sir."

On his cross-examination he says that he saw Ball going up to the platform, and that Copeland was already there, and that he saw them mending the belt.

"They were both sitting astride the two planks [constituting the platform], facing each other. * * * Ball had his back to me and * * * Copeland held it [the belt], and Ball laced it. * * * Q. At the time you saw him [Ball] standing there, in what position was Copeland? A. Sitting still facing me."

On his redirect examination he says:

"I presume he [Copeland] was about the center of the two pulleys. * * * He was east of the pulley [to which the cross belt was to be adjusted]. Q. Where was Ball? A. He was west. Q. The pulley was between them? A. Yes, sir; about even with their heads, while sitting down. Q. Which way was Copeland facing? A. Facing west. Q. Was he astride of the plank? A. Yes, sir. Q. And Ball was facing east? A. Yes, sir."

Being asked how much time elapsed between the moment when Ball asked him for the knife and the moment of the accident, he says (as a guess):

"It was about 15 minutes."

Copeland (called for defendant) testifies in part as follows:

"We were sent up there to mend a belt, up there in the loft. After the job was done, we were sitting there talking, and the belt caught his hand and killed him. * * * Q. At the time he was caught, had you finished mending the belt? A. Yes, sir. Q. What were you doing at the time he was caught? A. Talking. Q. What else? A. He had the belt, holding it in his hand. Q. In which hand? A. In his left hand. * * * Q. What was he doing with the other hand? A. He was patting it on top of the shaft. * * * Q. Was the shaft still revolving? A. Revolving * * * about 125 revolutions to the minute. * * * Q. Was he doing anything, at the time he was caught, towards mending the belt? A. No, sir. Q. Had the job been completed? A. Yes, sir. Q. What, if anything, was he doing at that time towards putting it on the pulley? A. Nothing at all. Q. What, if anything, was said by you to the deceased, Willie Ball, or by Willie Ball to you, as to the danger of doing as he was? A. I told him he had better leave it alone; that's all. Q. What did he say? A. Nothing; just kept talking. * * * Q. How long had he been up there before the acci-

dent and since you had finished mending the belt? A. We had been up there about 20 minutes, at the time he was killed. * * * Q. How long, after you had finished mending the belt, was it before the accident? A. I guess 10 or 15 minutes. * * * Q. How long did it take you to fix the belt? A. About 5 minutes. * * * Q. In what position were you while Willie laced the belt? A. Standing up while he laced the belt. Q. How about when the accident occurred? A. We were sitting down. Q. Both of you? A. Yes, sir. * * * Q. Were you to the north, south, east, or west of him? A. West of him. Q. Which way were you facing? A. South. Q. Which way was Ball facing? A. South. Q. Were you astride of the plank or sitting on the side? A. On the side. Q. With your feet hanging down? A. Yes, sir. Q. Was Ball sitting in the same way? A. Yes, sir. * * * Q. Mr. Copeland, why didn't you go down, after you had finished lacing the belt? A. We were sitting there killing time. * * * Q. Mr. Copeland, where were you and where was Mr. Ball sitting, with reference to the pulley, on which side of it, east or west? A. West. Q. Both of you? A. Yes, sir. Q. Mr. Ball between you and the pulley? A. Yes, sir."

Endom (called for plaintiff), who was operating a lathe about 25 feet to the southward of a point immediately beneath the place where the accident occurred, testifies as follows:

"Q. Did you see the boys while they were up there? A. I did. * * * Q. When they went up there, what did they do; that is, at the time that you saw them? A. At the time that I saw them, Copeland was sitting down and Ball was lacing the belt. Then I saw Copeland falling out of the loft, or, rather, sliding down the air hoist. Q. It was some little time between the time you saw Copeland sitting and Ball lacing the belt and the time you saw Copeland sliding down the air hoist? A. Yes, sir; I guess, five minutes; it might have been more. Q. About how long were they up there, altogether? A. Fifteen or 20 minutes. * * * Q. When you last saw them, which way was Copeland facing? A. Facing south. Q. Which way was Ball facing? A. Same position. He was standing up and Copeland was sitting down. Q. Was Ball east or west of Copeland? A. East of Copeland. * * * Q. Standing up? A. Yes, sir. Q. Copeland at his right, sitting down? A. Yes, sir. Q. Could you be mistaken about their position? A. No, sir; I couldn't. Q. What about the position of Ball and Copeland, in regard to the pulley on which the belt ran, as to whether they were east or west of it? A. They were north of it; Copeland was west of it, and Ball was just in front of it—you could call it east."

It otherwise appears that, either because Ball patted, or holding both plies in his hand, pulled the belt down, the main shaft seized upon the belt, and, wrapping, so shortened it that the shaft itself, the counter shaft, or the belt was obliged to give way, with the result that the belt broke; the unfortunate lad being, in the meanwhile and afterwards, wrapped against, and carried around by, the shaft, and instantly killed. The belt in question was 2¼ inches wide, and, though it had been used for some time and mended on several occasions, it is not shown to have been insufficient for the purpose for which it was used. It appears from the testimony of several witnesses, whom there has been no attempt to contradict, that it has been for years the practice and understood rule in defendant's shop for each operator to mend the belt driving the machine operated by him, where such repairs become necessary, and it is shown to be the general, if not universal, custom to make such repairs to belts, as light as that here in question, whilst the main shaft is in motion; the weight of such a belt not being sufficient of itself, to enable the shaft to take hold of it, and the stopping of the main shaft usually involving a practical shutting down of the entire plant. It also appears that the danger incurred in lacing and adjusting such a belt, under such conditions, is not greater than that incurred in operating one of the machines (it being necessary, in any event, to put the shaft in motion in order to adjust the belt to the pulley); that it is one of those things that a machinist learns, as part of his trade; that all of defendant's apprentices, during the last 15 or 20 years, have learned it; that the deceased had done it frequently; and that no accident had ever before happened, in the doing of it, in defendant's shop; and several experienced machinists testify that they never heard of such an accident elsewhere. It further ap-

pears that, after the accident here in question, the relatives of some of the other apprentices became uneasy on their account, and that defendant's master mechanic, having charge of its shop, partly for that reason and partly because he found it expedient in a business way, assigned a workman to the duty of looking after the belts during the dinner hour, and of making such repairs as he could then make; and, if the belt of a particular machine breaks during the working hours, the workman so assigned and the operator of the machine together repair it. The workman assigned to the duty in question, at the date of the trial, we understand, was an apprentice.

Plaintiff introduced a witness named Downes, who testified that he met Copeland some months after the accident, and (to quote):

"We were talking, and it happened to come up about Willie Ball, and we said, 'How bad it was,' because the boy was a bright fellow, with bright prospects. I said that, and then he says: 'I seen it all, and, if there was any money in it, I could testify either way and let either side win the case,' and then he said: 'What would you do?' And I said: 'I don't know about that. I might be pretty poor; but I don't never want no money that way.' And that was all he said about it."

Plaintiff herself testified that Copeland came to see her, about 10 or 12 days after the accident, and (to quote):

"I asked him exactly how my son came to his death, and he said, 'In putting on the belt his hand was caught, and he was killed,' and he said, 'The last words he spoke were "Oh, God!"'"

With regard to the alleged conversation with Downes, Copeland testifies that he remembers saying:

"'I would like to see Mrs. Ball get something out of this.' But I did not say the other" (referring to the question, "Didn't you tell him that you would like to see the Widow Ball get something out of this, but that you could testify in favor of the one that had the most money for you?").

He admits that he had a conversation with plaintiff, but denies that he told her that the accident occurred while her son was putting on the belt, and says:

"I told her that the belt caught him, but he was not putting on the belt at the time."

There was a verdict for plaintiff, which was made the judgment of the court, and defendant has appealed.

### Opinion.

It is evident that McCranie and Endom did not see Ball at the same time, since Endom saw him, five minutes or more before the accident, standing, whereas McCranie saw him first when he was going up to the platform, and then when he was seated, lacing the belt, and lastly, for an instant, standing, and in the same instant going over the shaft. The two witnesses, it will be observed, disagree as to the relative positions of Ball and Copeland; McCranie placing Ball to the westward and Copeland to the eastward, about the center of the pulleys, with the pulley to which the belt was to be adjusted between them, whilst Endom, with equal positiveness, places Copeland to the westward and Ball to the eastward, just in front of the pulley. "You could call it" (he says) "east" of the pulley. Endom was much nearer the scene of the tragedy than McCranie, and, as to which of the two young men was to the westward and which to the eastward, he is corroborated by Copeland, though he differs with the latter, in that Copeland says that he and Ball both were seated when the belt was being laced, whilst Endom says that Ball was standing when he saw him, and was lacing the belt, and that Copeland was seated. The difference is, however, easily explained, as they may have finished lacing the belt at the moment, and Copeland may have taken his seat, leaving Ball still standing; for Endom, be it noted, upon being asked how long it was,

after he saw Ball standing, before the accident occurred, replied, "I guess, five minutes; it might have been more," and, as he elsewhere says that "he was busy, running a lathe," it is quite possible that considerably more than five minutes may have elapsed. We are inclined to think, too, that there are certain physical facts which tend to corroborate the testimony of Endom and Copeland, to the effect that the latter was to the westward of the former and of the pulley; for, if he had been where McCranie places him, he would have had the two pulleys (which are alongside of each other) between him and the south side of the platform, and yet it is an undisputed fact that, when Ball's body was carried around the shaft, it broke one of the planks of the platform and displaced the other, and that Copeland fell, or jumped, several feet and grasped the "air hoist" (which appears to be to the south of the platform and to the westward of the pulley) and slid down it to the floor. We may say, here, that, beyond the statements of Downes and the plaintiff, there was no attempt to discredit Copeland or to impeach his character for veracity, and we think it quite possible that he may have been misunderstood by those witnesses. At all events, we should not be disposed to infer, even if it should be conceded that Copeland made the discreditable remark attributed to him by Downes, that he would, at the pinch, commit deliberate perjury, and we find nothing in his testimony as given to warrant the conclusion that he has done so. He says that he and Ball finished their job in about five minutes, and there are several witnesses who testify that it ought to have been finished within that time. He testified that about 20 minutes elapsed between the time when they reached the platform and the moment of the accident, and McCranie "guesses" that it was 15 minutes, and Endom says that it was 15 or 20 minutes. He says that after they finished lacing the belt they sat down, with their feet hanging over the edge of the platform, to talk and kill time. We find nothing improbable in that, and McCranie says that he saw them both sitting down. He says that, while they were thus seated, Ball holding the two plies of the belt in his hand, with the shaft (within a few inches of—in fact, almost against—him) running through the loop between them, Ball employed his idle hand, as he talked, in patting the belt against the shaft, and we can imagine that he might have done so without realizing that a slight fold or kink in the light, flexible belt might enable the shaft to take hold of it and whirl him into eternity. All things considered, the story that he tells on the stand seems to us to be consistent and well supported, and we are forced to the conclusion that Ball met his death while assuming an unnecessary risk, and while not engaged in the discharge of any duty assigned to him by, or that he owed to, the defendant. But, even if it were otherwise, the most that can be said is, not that he was killed whilst lacing the belt about a revolving shaft which might have been stopped, but that he was killed whilst adjusting the belt to a revolving pulley, which might have been stopped. The uncontradicted evidence, however, is that the belt can be put on, or adjusted to, the pulley only when the latter is in motion; that the mending and putting on of a belt, under such conditions, is an ordinary incident in the everyday work of a machinist, and is as necessary to the education of an apprentice as anything else that he is required to learn; and that it had frequently been done by Ball, during the 2 years and 7 months that he had worked in defendant's shop.

We are therefore of opinion that he must be presumed to have known and to have assumed the incidental risk, and upon the whole we find no sufficient basis upon which to hold the defendant liable.

It is therefore ordered, adjudged, and decreed that the verdict and judgment appealed from be annulled and set aside, and it is further decreed that plaintiff's demand be rejected, and this suit dismissed, at her cost.